Filed 1/31/23  In re M.W. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.W., a Person Coming Under the Juvenile Court Law. | B313423 & B316959 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NORA H.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP00690A) |

APPEAL from order of the Superior Court of Los Angeles County.  Michael D. Abzug and Philip L. Soto, Judges.  Affirmed in part, reversed in part and remanded with directions.

Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

————————————————

# INTRODUCTION

In these two consolidated appeals, Nora H. (Mother) challenges the juvenile court's jurisdictional and dispositional orders, and its exit orders terminating jurisdiction and granting sole physical custody and shared legal custody to her child's father (Father).

The juvenile court assumed jurisdiction over M.W., now a teenager. It sustained allegations that M.W. had suffered or was at risk of suffering serious emotional damage within the meaning of Welfare and Institutions Code section 300, subdivision (c),[1] due to both parents' actions in their protracted custody battle (count c-2) and Mother's "ongoing" "yell[ing]" at M.W. (count c-1). Mother appealed. Father did not appeal.

While Mother's appeal was pending, the juvenile court terminated its jurisdiction and issued custody orders. Mother appealed. Father did not appeal.

In the first appeal, we reverse the juvenile court's assumption of jurisdiction under section 300, subdivision (c), count c-1. There is insufficient evidence that Mother's actions caused M.W.'s emotional distress. We find this claim justiciable, despite Father's lack of an appeal, because it has the potential to cause Mother prejudice, and may have caused Mother prejudice already, as evidenced by the juvenile court's custody orders. We decline to address Mother's appeal as to count c-2, which is also based on Father's actions.

As to the second appeal, Mother's appointed counsel filed a brief under *In re Phoenix H.* (2009) 47 Cal.4th 835 (*Phoenix H.*), asserting that there were no appealable issues. Mother's

---

[1]     All subsequent statutory references are to the Welfare and Institutions Code.

supplemental brief does not raise any new, cognizable legal issues that were not in the first appeal. However, we reverse and remand for reconsideration of the appealed custody orders. The juvenile court erred in sustaining jurisdiction based on count c-1. This finding may have erroneously impacted the exit orders, which leave Mother significantly worse off as to custody than when the dependency proceedings began.

We affirm in part, reverse in part, and remand for reconsideration of the exit orders consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Pre-Petition Events

Mother and Father were married in 2007. Their only child, M.W.,[2] was born in April 2008.

Mother filed for divorce in 2014. After a trial in March 2018, the family court issued a dissolution of marriage judgment and custody orders. The custody orders gave primary physical custody of M.W., who was then almost 10 years told, to Mother. Father had physical custody every other weekend and Wednesdays. A few months later, the court granted Mother sole legal custody after holding Father in contempt of court for failure to report income.

On January 25, 2021, when M.W. was 12 years old, Father refused to return M.W. to Mother at the end of his scheduled visit time. Mother filed an ex parte request with the family court

---

[2]     M.W. changed their name and pronouns after briefing in the first appeal, and this change is reflected in Mother's supplemental brief in the second appeal. For consistency with the juvenile court, briefing, and court records, we use "M.W." as the child's name, but use their preferred gender-neutral pronouns, which are they/them/their/themselves.

seeking return of M.W.  It is not clear what occurred with this ex parte request, but it was apparently unsuccessful.  Mother filed a second ex parte request, this time with counsel, on January 29, 2021.  The family court denied the request on the ground that there was an insufficient showing of risk of removal of M.W. from the state to merit a grant of the order.

The same day Mother filed her first ex parte request, the Los Angeles County Department of Children and Family Services (DCFS) received a hotline referral about M.W.  It alleged that M.W. was cutting themselves after being at Mother's home.  The caller also stated that M.W. does not eat when they are at Mother's home, and that Mother "went berserk" in the kitchen recently and "slammed" cabinets.

That same day, DCFS sent a social worker (department investigator or DI) to Father's home to interview M.W.  M.W. told the social worker that they have been cutting themselves since they were seven years old.  They also said that they do not eat at Mother's home because they do not want to be "obese" like Mother.  M.W. expressed that they did not want to live with Mother and preferred to live with Father.  M.W. described Mother as "abusive."  When asked to elaborate, M.W. stated that Mother once put laxatives in M.W.'s food, Mother "is constantly yelling at [them]," and Mother yells approximately four times a week.

On February 1, 2021, the DI interviewed M.W.'s therapist.  The therapist was concerned that if M.W. were returned to Mother, M.W. would self-harm and have suicidal ideation.  M.W. had a history of cutting themselves with a knife and considering suicide, as detailed below.  M.W. had been in therapy

4

at this point for several years, at least since it was ordered by the family court in 2017.

On February 2, 2021, Father filed an ex parte request in family court stating he did not want to return M.W. to Mother. On February 3, 2021, the family court ordered Father to return M.W. to Mother by 8:00 p.m. that day. Father returned M.W. to Mother.

On the morning of February 4, 2021, M.W. was brought to a hospital, apparently on M.W.'s therapist's recommendation. M.W. was placed on a hold for suicidal ideations and their history of self-harm.

According to an anonymous caller to the DCFS hotline, M.W. did not want to go home to Mother when they were released from the hospital. The caller said that if M.W. could be released to Father, then they would not self-harm. The caller also said that Mother has "rage issues" and "responds with more force than necessary." The caller did not elaborate.

On February 10, 2021, a judge granted DCFS's request to remove M.W. from Mother and place them with Father.

## II. Petitions and Detention Hearing

On February 17, 2021, DCFS filed its first section 300 petition. The petition alleged that Mother had emotionally abused M.W. within the meaning of section 300, subdivision (c) by "yell[ing]" at M.W. on "numerous prior occasions" and causing M.W. "extreme emotional distress."

That same day, on February 17, 2021, the court held a detention hearing on the first petition and detained M.W. from Mother.

In March 2021, DCFS filed a first amended petition, which was then superseded by a second amended petition filed in April 2021.

The second amended petition, which the court ultimately sustained, again alleged that M.W. came within the jurisdiction of the juvenile court under section 300, subdivision (c). There were now two counts alleged under subdivision (c). First, count c-1 alleged that Mother had "emotionally abused" M.W. because on an "ongoing basis" Mother had "yelled" at M.W. This had "caus[ed] the child to experience extreme emotional distress." Second, count c-2 alleged that both Mother and Father had "created a negative and endangering environment due to the child being caught in the middle of a bitter, contentious, and protracted custody battle, which has resulted in the child suffering serious emotional damage."

## III. Jurisdictional and Dispositional Hearing; Mother's First Appeal

On May 6, 2021, the juvenile court held a jurisdictional and dispositional hearing on the second amended petition. By that time, Mother and M.W. had not seen each other since early on the morning of February 4, 2021. M.W. had refused all contact, including joint therapy with Mother. Father waived his rights and pled no contest.

The juvenile court held a contested hearing on the allegations concerning Mother. The court sustained the second amended petition under section 300, subdivision (c) as to Mother on counts c-1 and c-2. In doing so, the court did not cite any specific conduct, other than yelling, in finding that Mother's actions had caused M.W.'s emotional distress or were at risk of causing it. The juvenile court found that the behavior M.W.

6

exhibited could not be attributed to a "garden variety divorce" and stated that Mother's counsel "is correct . . . the minor was unable to describe exactly what the yelling was about, but I think that level of yelling can reach a level, and quite clearly has based on the circumstantial evidence in the record, to constitute the type of abuse" alleged against Mother. The court then declared M.W. a dependent of the court and placed M.W. in the home of Father.

Mother filed an appeal in June 2021. Father did not appeal.

## IV. Section 364 Hearing, Exit Orders, and Mother's Second Appeal

On November 4, 2021, the juvenile court held a section 364 judicial review hearing where it terminated jurisdiction, but it stayed the termination until it issued custody orders.

On November 12, 2021, the court held a custody order hearing. Over Mother's objections, the court terminated jurisdiction, ordered physical custody of M.W. to Father, and ordered joint legal custody to both parents. It gave Father the tie-breaking vote as to legal custody. Mother was to have visits in a therapeutic setting "as arranged by the parents."

Mother appealed the November 12 order. Mother's appointed counsel filed a brief in that appeal pursuant to *Phoenix H., supra*, 47 Cal.4th 835. Mother filed a timely supplemental brief asserting her own arguments.

## V. M.W.'s Prior Child Welfare and Mental Health History

According to M.W., they began self-harming when they were seven years old, which is sometime in 2015 or the beginning of 2016. M.W. began cutting themselves at school when they

7

were stressed. They began their self-harm by scratching their legs with scissors and later used a knife.

M.W. said that both of their parents were aware of their cutting since they were about eight or nine years old. According to M.W, when they were nine, they began cutting themselves when they had to return to Mother's home from Father's. This was around the time that they were told by an unidentified individual that Mother wanted primary custody.[3]

Mother said she became aware of M.W.'s cutting when M.W. was nine years old. At that time, Mother said that M.W. would use their nails to scratch themselves. Mother reported that she was told to leave the cutting issue to M.W.'s therapist, who would track the cutting episodes. Mother was to hide knives from M.W. and monitor M.W.'s emotions.

On the night of September 11, 2019, Mother took M.W. to the emergency room for cutting and suicidal ideation. A therapist had reported seeing signs of M.W.'s self-harm to M.W.'s school. The therapist said that she had tried to contact Father who had blocked the therapist's number and was refusing to take M.W. to therapy. The medical professionals at the emergency room recommended a "partial hospitalization program" for M.W., and continued therapy and medication (M.W. was already taking Zoloft when they arrived at the hospital).

---

[3] After informally separating sometime around 2012, the parents initially shared physical custody "50-50" under a "verbal agreement." After the family court finalized the divorce and issued the custody order in 2018, the arrangement became Father having custody every other weekend and Wednesdays.

A caller to the DCFS child protection hotline reported M.W.'s September 2019 hospitalization. During DCFS's investigation of this incident, it was discovered Father did not approve of M.W. taking medication or attending the recommended partial hospitalization program, so they never did the program, which required both parents' participation. M.W. also stopped taking medication due to M.W.'s "lack of compliance with medication and lack of desire to continue."

While investigating M.W.'s hospitalization, the DI asked M.W. about their "triggers," and they replied "stuff with [their] parents." The DI also asked Father. Father stated that he thought M.W. had been getting worse in the six months before the hospitalization due to a change in custody arrangements, which he admitted took place three years prior. He thought Mother was partly to blame, but he did not elaborate besides stating that Mother and M.W. had a "strained relationship." At some point, Father agreed to call M.W.'s therapist and to attend a "safety meeting," so DCFS closed the referral as inconclusive.

In an August 2020 e-mail, Mother informed M.W.'s therapist that she had seen scratches on M.W.'s neck the night before M.W. was going to see Father, who M.W. had not seen in a long time. It is not clear what the therapist did with this information.

In September 2020, M.W. was diagnosed with an eating disorder by a medical doctor who wanted M.W. to be seen by a psychiatrist. It is not clear if M.W. ever saw a psychiatrist.

The family next came to the attention of DCFS on January 25, 2021. DCFS received a call to its hotline. The caller reported that Father said that M.W. had been cutting themself

9

while at Mother's home, it was "really bad" at Mother's, and M.W. was afraid of Mother. According to the reporting party, M.W. spoke to their therapist that same day and M.W. said that they would not self-harm if they were at Father's house.

On February 4, 2021, after the family court ordered M.W. returned to Mother based on the custody order, M.W. was hospitalized a second time based on the request of their therapist. A caller to the DCFS child protection hotline that same day said that when questioned about Mother's alleged emotional abuse, M.W. said that Mother "requires codependency, she['s] bipolar,[4] yells." M.W. also allegedly told the caller that Mother "plays the victim" and was out of M.W.'s life and was now "coming back and has full legal custody and partial physical custody."[5]

When questioned by DCFS in March 2021 about what Mother was doing to cause M.W.'s symptoms, Father said that Mother was "very rigid in her expectations of achievement" and she "lashes out and yells at [M.W.]." He did not know what Mother said when yelling.

---

[4]    There is no evidence in the record that Mother has been diagnosed with a mental illness. Father told DCFS that Mother had been diagnosed with borderline personality disorder, but this was later found not to be true. The DCFS investigator described Father as constantly diagnosing Mother with mental health issues, and himself with posttraumatic stress disorder due to Mother.

[5]    The parties do not point us to any evidence that there was a gap in Mother's relationship with M.W. or custody. Because Mother had primary custody until the removal order in this case in February 2021, it is unclear what this statement attributed to M.W. by the unknown caller is based upon.

DCFS also questioned the doctor who treated M.W. in February 2021. The doctor stated that M.W. reported that Mother was impacting their mental health, but would not give specifics, aside from saying that Mother yelled. The doctor also stated that despite M.W.'s characterization of cutting as "situational" and due to Mother, cutting is rarely situational and does not resolve by going from one home to another.

According to the DCFS jurisdictional/dispositional report dated April 7, 2021, Mother "was blamed for [M.W.'s] self-harming behaviors albeit nobody could provide a coherent and cohesive narrative regarding mother's alleged abuse of [M.W.]. As the investigation progressed, father when [*sic*] unable to coerce mother to agree to his terms and conditions regarding [M.W.'s] living arrangement, [M.W.'s] self-harming behavior escalated." The report went on to describe behavior by Father that it viewed as harming the Mother-child relationship. It also noted the ways that Father had prevented M.W. from getting medication and therapy. The same report quoted M.W.'s therapist as telling DCFS that M.W. is "full of different stories," "manipulative and lies," and Mother has been "made to look like a monster. I have no information to support why."

Between the detention hearing, when M.W. was removed from Mother, and adjudication, there is only one report of self-harm in the record. Father reported to the DI that M.W. had cut themselves because their cat was euthanized, which Father described as "understandable."

# DISCUSSION

## I. Mother's First Appeal Is Justiciable as to Count C-1

We begin by addressing whether Mother's first appeal is justiciable.

Mother appealed the juvenile court's assumption of jurisdiction, but the juvenile court terminated jurisdiction on November 12, 2021. Even where the juvenile court has terminated jurisdiction, where a jurisdictional finding serves as the basis for dispositional orders that are also challenged on appeal, "the appeal is not moot." (*In re D.P.* (Jan. 19, 2023, S267429) ___Cal.5th___ [2023 Cal.LEXIS 131 at p.*26].) Accordingly, Mother's appeal of the jurisdictional order has not been rendered moot by the juvenile court's subsequent termination of jurisdiction. The juvenile court assumed jurisdiction over M.W. not only due to Mother's actions alleged in count c-1, but also due to both parents' actions alleged in count c-2. Father did not appeal. "[W]here jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*In re D.P.*, *supra*, ___Cal.5th___ [2023 Cal.LEXIS 131, at p. *27].) However, we have discretion to address the merits of a jurisdictional challenge by only one parent, where, as here, the jurisdictional ruling could be prejudicial to the appellant. (*Id.* at p. *30.) In sustaining count c-1, the juvenile court found that Mother emotionally abused M.W. by engaging in conduct above and beyond that alleged against both parents in count c-2. This could be prejudicial to Mother and have other consequences for Mother beyond jurisdiction. It may have already had consequences for Mother in this very case. Before this dependency proceeding, Mother had primary physical custody of M.W. and full legal

12

custody. She now has no physical custody and joint legal custody. While it is not clear from the record, Mother may have been prejudiced by the challenged jurisdictional ruling that was premised solely on her actions. We therefore exercise our discretion to consider Mother's appeal as to count c-1.[6]

We do not address count c-2. Unlike count c-1, there is no indication that count c-2 prejudiced Mother, or may in the future. Mother is not accused of additional conduct beyond that of what she allegedly shared with Father, and Father was not prejudiced by it. Indeed, he was significantly better off in terms of custody orders at the end of the dependency proceeding than at the beginning.

## II.    The First Appeal

Appellate courts review challenges to the juvenile courts' jurisdictional findings and dispositional orders for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) Substantial evidence " 'is not synonymous with any evidence. [Citations.] A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' " (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

---

[6]    DCFS filed its brief in the first appeal on March 10, 2022, *after* the juvenile court terminated jurisdiction on November 12, 2021. DCFS did not argue that we lack jurisdiction, or otherwise assert that we should dismiss the case as moot. We take this as an indication that they have no objection to our review of this matter on the merits. Because we have an independent duty to ensure that we have jurisdiction, we have addressed this issue.

Count c-1 alleged that "[o]n numerous prior occasions [Mother] . . . emotionally abused the child, in that, on an ongoing basis, the mother yelled at the child causing the child to experience extreme emotional distress." "The Mother's ongoing abuse of the child places the child at substantial risk of suffering serious emotional damage . . . ."

Under section 300, subdivision (c), the juvenile court may exercise jurisdiction over a child when "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, *as a result of the conduct of the parent or guardian* or who has no parent or guardian capable of providing appropriate care." (*Ibid.*, italics added.)

Where the parent's conduct is the alleged cause of the emotional damage, the agency must prove the offending parent's conduct, causation, and emotional harm. (*In re Roxanne B.* (2015) 234 Cal.App.4th 916, 921.) Mother does not deny that M.W. exhibits evidence of emotional distress, but argues there is insufficient evidence that her alleged conduct in count c-1 caused it.

We agree. There is scant evidence linking Mother's alleged ongoing yelling to M.W.'s emotional distress, let alone the "emotional abuse" as alleged in the petition. The addendum report prepared for the jurisdictional hearing stated that M.W. had only identified one thing about Mother as a source of M.W.'s emotional distress: her yelling. When asked by DCFS and medical professionals if Mother used profanity or said anything in particular when yelling, M.W. could not say. Aside from yelling approximately four times a week, slamming cabinets on

14

one occasion, and being rigid in expectations of achievement, there is nothing specific identified about Mother as constituting the alleged emotional abuse.

The appellate court in *In re Alexander K.* (1993) 14 Cal.App.4th 549 (*Alexander K.*) was faced with the question of "how can a court evaluate whether a child of a 'broken' marriage suffers or is at risk of suffering serious emotional damage as a result of the conduct of a parent—as opposed to the inevitable tensions that result from the marital dissolution itself and ensuing visitation disputes—when the offending conduct is not specified? What level or type of behavior triggers the statute under these circumstances?" (*Id.* at p. 558.) To answer that question, the court looked at the legislative history of section 300, subdivision (c) and reasoned, "[i]t is clear from the overall scheme that the parental conduct branch of subdivision (c) seeks to protect against *abusive behavior* that results in severe emotional damage. *We are not talking about run-of-the-mill flaws in our parenting styles—we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute.*" (*Alexander K.*, at p. 559, italics added.)[7] Here, there is no evidence that Mother's yelling was demeaning, mean, irrational, or otherwise abusive. We must tread carefully when a case presents parental conduct that may have upset the minor, but falls within the commonly accepted range of disciplinary communication between parents and children.

---

[7]     We favorably cited this reasoning in *Alexander K.* in our decision in *In re Mariah T.* (2008) 159 Cal.App.4th 428.

15

The timeline of events also suggests that Mother was not the cause of M.W.'s self-harm and suicidal thoughts. M.W. told DCFS that they began cutting when they were seven years old, and only when they were stressed at school. M.W. said they were "okay with [their] Mother" until age nine. M.W. also stated that when they were 10 years old, their custody arrangement changed from 50-50 to Father having Wednesdays and every other weekend. M.W. said that a year after this change, when they were 11, they began feeling "hopeless" and their "eating disorder" commenced. M.W. did not know what triggered their eating disorder, but they said they were self-conscious about their weight. In 2019, when M.W. was first hospitalized, they said that their self-harm was trigged "mainly [by] stuff with [their] parents." They did not specifically mention Mother. After M.W.'s second hospitalization in February 2021, a DCFS social worker reviewed text messages between Mother and M.W. sent the week before. The social worker concluded that M.W. did not seem fearful of their Mother, in distress, or having any "discord" with Mother in the text messages. The text messages between Mother and M.W. *before* M.W.'s February 4 hospitalization consist of memes about politics and millennials, photos of M.W. with other children, and discussions of the weather and M.W.'s cat being sick.

Nowhere did M.W. directly say that Mother caused their feelings and self-harming behaviors. M.W. said they progressed from self-harming just at school to also upon M.W.'s return to Mother's house. But M.W. self-harmed at Father's house on at least one occasion when their cat died, which was after they last saw Mother. Father also did not always report M.W.'s cutting or take them for medical care.

The DCFS reports prepared for the jurisdictional hearing were also devoid of evidence of causation. This is despite containing notes of interviews with multiple mental health professionals who had treated M.W. Both M.W.'s psychiatrist and therapist reported that M.W. had not disclosed anything specific regarding abuse, being harmed, or feeling unsafe with Mother, but M.W. said that they wanted to live with Father. M.W.'s current therapist thought that remote classes due to the pandemic, then a transfer to a new school with in-person classes, and M.W. deciding to stop taking medication in April 2020 were contributing to M.W.'s escalating emotional distress before the second hospitalization in early 2021. A different therapist who had treated M.W. in the past said M.W. was "manipulative and lies," and did not know why Mother had been made to "look like a monster." A medical doctor opined that despite M.W.'s characterization of their cutting as "situational" and due to Mother when they were at the hospital in February 2021, cutting is rarely situational and does not resolve by going from one home to another.

Nor is there evidence that M.W. was at risk of future abuse by Mother. Before the jurisdictional hearing, Mother sought to change her behavior by asking for specifics of what she was doing to M.W. so that she could change. (See *In re A.J.* (2011) 197 Cal.App.4th 1095, 1106 [distinguishing § 300, subd. (c) case on the basis of whether the parents had shown a willingness to change their behavior].)

Our careful review of the record shows a difficult divorce, an escalating custody dispute, and a 12-year-old who was deeply emotionally disturbed and refused to return to their Mother because they preferred living with their Father. The juvenile

17

dependency courts must be cautious to ensure that contentious custody disputes properly remain in the family law courts, and that allegations of inappropriate parental behavior are properly substantiated. (*In re John W.* (1996) 41 Cal.App.4th 961, 975 ["The juvenile courts must not become a battleground by which family law war is waged by other means"].) Here, there is ample evidence of a bitter custody dispute between the parents. But the record lacks sufficient evidence of the required nexus between Mother's actions and M.W.'s mental distress. The juvenile court erred in focusing on M.W.'s "behavior and reactions, not the [parent's] behavior." (*Alexander K.*, *supra*, 14 Cal.App.4th at p. 559.)

We do not find sufficient evidence that Mother's yelling caused M.W.'s emotional distress.

## III.   The Second Appeal

In Mother's second appeal, she challenges the juvenile court's decision to terminate jurisdiction and the exit orders regarding custody. We affirm as to the termination of jurisdiction because she has raised no appealable issues, but we reverse and remand for reconsideration of the custody orders.

Mother's counsel filed a brief in the second appeal pursuant to *Phoenix H.*, *supra*, 47 Cal.4th 835. The brief stated that counsel was not able to identify any appealable issues.

Mother filed a timely supplemental brief asserting her own arguments. She argues that the juvenile court erred in terminating jurisdiction over M.W. and by changing the custody orders in Father's favor. In support, she makes several claims. Mother asserts that the juvenile court erred by failing to release all transcripts, but it is not clear if this is true or is relevant, as this allegation is unsupported. There also is a reporter's

18

transcript in the record that corresponds to the two hearing dates on which the orders in the second appeal are based.

Mother also vaguely argues that her due process rights were violated because she was not able to cross-examine adverse witnesses. No witnesses were called at the November 2021 hearings. A review of the record shows that Mother wanted to call a DCFS social worker to testify. Counsel's brief states that this was to correct information in an incorrect report submitted by the social worker. But Mother requested neither a continuance, so she could call the social worker, nor a contested hearing. DCFS also recognized a mistake in its prior report in regard to which parent held education rights, and it filed a Last Minute Information acknowledging this mistake prior to the November hearings. Mother does not explain her assertion further, so it is not clear if this is the mistake that is relevant to her alleged due process violation.

Mother also argues that the court failed to explain how it considered exposure of M.W. to domestic violence by Father when making its custody orders. This argument is raised for the first time on appeal. Mother does not cite any legal authority that the court was required to make such a finding on the record. Regardless, for other reasons, as stated below, we reverse and remand the custody orders.

Mother fails to support her various claims with citation to legal authority, as she was required to do to avoid waiving her claims. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Stanley* (1995) 10 Cal.4th 764, 793; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146, 153.) This is true even for a brief filed by a party who is unrepresented by

19

counsel. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247.)

In sum, we have reviewed Mother's brief in light of the record and find that she has not raised any new, colorable claim of reversible error or other legal defect for review in her second appeal. The claims in Mother's second appeal are therefore dismissed, except as to the custody orders. (*In re Sade C.* (1996) 13 Cal.4th 952; *Phoenix H., supra*, 47 Cal.4th at p. 846.)

The November 12, 2021 custody orders favor Father over Mother. They may have been influenced by the juvenile court's flawed finding that Mother had caused M.W. emotional abuse in count c-1. The only other basis for finding jurisdiction over M.W. was that both parents caused M.W. emotional harm through their actions during their divorce in count c-2. Yet, before this case, Mother had primary physical custody and full legal custody over M.W. The exit orders gave Father full physical custody and shared legal custody with tie-breaking authority over Mother. This suggests that the erroneous finding as to count c-1 may have impacted the exit orders as to custody. We therefore reject the claims in the second appeal, including the challenge to the termination of jurisdiction, except as to the custody orders. We reverse and remand for reconsideration of the exit orders regarding custody.

## DISPOSITION

We reverse the juvenile court's assumption of jurisdiction over M.W. under section 300, subdivision (c), as to count c-1 only. The exit order terminating jurisdiction is affirmed. The exit orders regarding custody are reversed and the matter is remanded with directions to hold a new section 364 hearing to

reconsider the final custody orders in accordance with the views expressed in this opinion.

HARUTUNIAN, J.[*]

We concur:

STRATTON, P. J.

WILEY, J.

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21